## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**COOPER TOOLS, INC.,**

        **Plaintiff,**

-v-

**INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,
LOCAL NO. 1040, UAW,**

        **Defendant.**

**Case No. 03-07-089**

**Judge Thomas M. Rose**

_____

**ENTRY AND ORDER GRANTING LOCAL 1040'S MOTION FOR
SUMMARY JUDGMENT (Doc. #13); OVERRULING COOPER'S
MOTION FOR SUMMARY JUDGMENT (Doc. #14) AND TERMINATING
THIS CASE**

_____

This is a dispute between Plaintiff Cooper Tools, Inc. ("Cooper") and Defendant

International Union, United Automobile, Aerospace and Agricultural Implement Workers of

America, Local Union No. 1040 UAW ("Local 1040") regarding the results of the arbitration of

a grievance. Cooper manufactures tools, universal joints, screwdriver products and special hand

tools and has a manufacturing facility at 762 West Stewart Street in Dayton, Ohio (the "Dayton

Facility"). Cooper's non-supervisory employees working at the Stewart Street manufacturing

facility are represented by Local 1040.

Cooper's complaint asks the Court to vacate an Arbitrator's Opinion and Award that was

issued on December 20, 2006 (the "Award"). Local 1040 counterclaims asking the Court to

affirm the Award and provide certain damages.

Now before the Court is a Motion for Summary Judgment filed by Cooper (doc. #14) and

A Motion for Summary Judgment filed by Local 1040 (doc. #13). Both of these Motions are
fully briefed and ripe for decision. A relevant factual background will first be set forth followed
by the standard of review and an analysis of the Motions.

## RELEVANT FACTUAL BACKGROUND

Cooper and Local 1040 have had a contractual relationship at the Dayton Facility for
many years. (Transcript of October 6, 2006, Arbitration Hearing before Richard E. Allen
(hereinafter "Tr.") 39.) In negotiating their 2004 collective bargaining agreement (the "CBA")[1],
the parties, among other things, agreed to extend the probationary period for new hires by thirty
days. (Tr. 40.) Thus, effective March 2004, all new hires are required to complete a sixty (60)
day probationary period before being covered by the terms of CBA. (Tr. 40; Stipulation of
Documents Ex. A Labor Agreement.)

### Relevant CBA Language

A part of paragraph 17 of the CBA is relative to this dispute. The relevant part of
paragraph 17 provides that:

> Seniority shall be established on the basis of working for the Company for a
> probationary period consisting of sixty (60) calendar days…. Dismissal or
> employment changes of an employee during the probationary period are not
> subject to the terms of this Agreement.

A part of paragraph 79 of the CBA is also relevant to this dispute. The relevant part of
paragraph 79 provides that:

> In the event of a grievance arising out of a difference with respect to the meaning
> and application of any provision of this Agreement shall not have been settled
> through the three (3) steps of the grievance procedure, the grievance shall, at the

---

[1]The CBA was entered into on March 7, 2004 and remained in effect until March 11,
2007.

demand of either party, be submitted to arbitration as set forth herein…. The arbitrator may consider and decide only the particular issue presented to him in writing by the Company and the Union and his decision must be based solely upon an interpretation of the provisions of this Agreement. The arbitrator shall not amend, take away, add to, or change any of the provisions of this Agreement.

## Termination of Employment

On August 10, 2005, George Rand ("Rand") was hired to work the second shift at the Dayton Facility. (Tr. 1, 10.) Rand was assigned to work as a journeyman electrician in the Maintenance Department. (Id. 130-31.) His duties included troubleshooting problems, maintenance of the facility and limited repair of machinery. (Id.)

On October 4, 2005, approximately thirty (30) minutes into the start of Rand's shift, Sean Towe ("Towe") observed Rand sleeping in the Dayton Facility's plant maintenance area. (Id. 15, 28, 130.) Towe, a manufacturing engineer, immediately informed Cooper's Manufacturing Manager, Jeff Ellis ("Ellis"), that he had observed Rand leaning back in a chair with his head tilted back, eyes closed and snoring. (Id. 13-15, 18, 19.) Ellis and Production Supervisor Dave Hopkins ("Hopkins") proceeded to the maintenance area where they too observed Rand sleeping. (Id. 19, 27.) Ellis concluded that Rand was sleeping after he stood only four feet from Rand and loudly called his name several times with no response. (Id. 19-20, 28.) Rand finally awoke after Ellis placed his hand on Rand's shoulder, shook him and called his name. (Id. 20.)

Rand admits that he was sleeping on the job. (Id. 41, 134.) Sleeping on the job is included on a list of dischargeable offenses in Cooper's Employee Handbook. (Tr. 49-50, Stipulation of Documents Ex. G. Page 12 of Employee Handbook.)

Ellis contacted Rand's supervisor, Charlie Hans ("Hans") and asked that he immediately issue a Suspension Pending Discharge Notice to Rand. (Tr. 21, 35.) Hans was the second shift

maintenance supervisor and thus was Rand's supervisor. (Tr. 21.) Hans prepared and signed the

Suspension Pending Discharge Notice which was handed to Rand. (Tr. 33, 35, Stipulation of

Documents Ex. H.)

Before leaving the Dayton Facility, a meeting was held at Rand's request. (Tr. 21, 22,

31.) The meeting was attended by Rand, Hopkins, Hans, Ellis and Union Shop Steward Roger

Cooper (" R. Cooper"). (Tr. 21, 22, 31.) During this meeting, Rand apologized for sleeping and

pledged never to sleep on the job again. (Tr. 36.) Cooper proceeded with disciplinary action

against Rand for violating Cooper's Employee Handbook. (Tr. 21, 33, 35,.)

### The Grievance

On October 5, 2005, Michael Soriano ("Soriano") received a notice from R. Cooper

requesting a hearing to discuss Rand's discharge. (Tr. 39.) Soriano is Cooper's Human

Resources Manager for its Dayton and Springfield operations. (Tr. 37.) As Cooper's Human

Resources Manager, he is responsible for handling employee grievances, disciplinary matters,

safety and security issues, and negotiating the collective bargaining agreements. (Tr. 37-38.)

Since Soriano was familiar with Rand's date-of-hire and knew the length of the

probationary period set forth in the CBA, he informed Local 1040 that Rand was not subject to

the CBA because he was a probationary employee. (Tr. 38-40.) However, out of professional

courtesy, Soriano agreed to meet with Dwight Ivy ("Ivy"), Local 1040's Shop Chairman, to

discuss Rand's suspension pending discharge. (Tr. 40, 103.)

This meeting was held on October 10, 2005. (Tr. 40, 73.) It was attended by Rand, Ivy,

R. Cooper, Soriano and Wallace Davis ("Davis"), the Dayton Facility's Plant Manager. (Id.)

At the beginning of this meeting, Soriano informed Rand, Ivy and R. Cooper that Cooper

had agreed to the meeting out of professional courtesy and that, although it was willing to listen to Rand's explanation for his conduct, Rand was a probationary employee and, therefore, not subject to the CBA. (Tr. 43.) During this meeting, Rand provided no exculpatory reasons for sleeping on the job. (Tr. 41, 78.)

Following this meeting, Soriano informed Rand by letter dated October 14, 2005, that Rand's suspension had been converted to a discharge from employment. (Tr. 41, Stipulation of Documents Ex. I.) This letter also informed Rand that, as a probationary employee with less than sixty (60) days of employment, he was not subject to the terms of the CBA. (Tr. 5-7, Stipulation of Documents Ex. I.)

On October 28, 2005, Local 1040 filed a grievance with Soriano on Rand's behalf. (Tr. 44; Stipulation of Documents Ex. J.) Soriano responded that Rand was discharged for just cause for sleeping on the job and that dismissal during the probationary period is not subject to terms of the CBA. (Stipulation of Documents Ex. J.)

Local 1040 then filed an information request with Cooper in connection with Rand's discharge. (Tr. 44.) Soriano responded to the information request by providing some of the information requested and reiterating that Rand was not covered by the CBA. (Tr. 44.)

On December 12, 2005, a third-step grievance meeting was held. (Tr. 44-45.) Cooper's management indicated that they were willing to listen at step three out of professional courtesy to Local 1040. (Tr. 45.) Soriano responded to the grievance by again indicating that Rand was not covered by the CBA and that Cooper had good cause to terminate Rand's employment. (Tr. 46.) Soriano and Davis attended this meeting on behalf of Cooper. (Tr. 45.) Ivy, Joe Hasenjager, James Erbaugh who was the President of Local 1040, and Paul Hudson attended this meeting on

behalf of Rand. (Id.) Several bargaining committee members also attended this meeting. (Id.)

At this meeting, Local 1040 requested that Rand be reinstated immediately. (Id.) On December 27, 2005, Soriano responded that, "[t]he Company has repeatedly maintained the position that George Rand's termination as a probationary employee for sleeping on the job is not subject to the Grievance and Arbitration Procedure under the Labor Agreement. Furthermore, the discharge was for just cause." (Stipulation of Documents Ex. K.)

## The Arbitration

The Parties then proceeded to arbitration. (Tr. 1.) The arbitration was conducted on October 6, 2006, in front of Arbitrator Richard Allen (the "Arbitrator"). (Tr.1.)

The grievance indicates that Local 1040 is "grieving the suspension/discharge of Mr George Rand…. The decision to terminate Mr. Rand was unfair due to the fact that no employee has been discharged for sleeping on the job without at least a last chance agreement. He was, based upon the employee handbook, a full time employee at the time of discharge." Cooper's response indicates that Rand was suspended pending discharge and subsequently discharged for sleeping on the job, that sleeping on the job has been established as just cause for termination, that any last chance agreements have involved employees with greater years of seniority and that Rand was a probationary employee and not subject to the terms of the CBA.

The record does not indicate what, if any, specific issue, other than the grievance, was presented to the Arbitrator by the Parties. However, the issues addressed by the Arbitrator were, "Does the "just/proper cause" standard apply to the termination of a probationary employee? If so, was the Grievant, a probationary employee, discharged for "just/proper cause.?" (Stipulation

of Documents Ex. C.)

**The Arbitration Award**

On December 20, 2006, the Arbitrator issued the Award. (Stipulation of Documents Ex. C.) In the Award, the Arbitrator reviewed the circumstances surrounding Rand's discharge and the results of the grievance process. (Id.) He identified relevant documents including the CBA and Cooper's Employee Handbook. (Id.) He specifically identified paragraph 17 of the CBA and the relevant sections of the Employee Handbook. (Id.) He then proceeded with his "Findings of Fact." (Id.)

In sum, he found that Rand was hired on August 10, 2005, and was suspended on October 4, 2005, for allegedly sleeping on the job. (Id.) He noted that Rand was suspended on October 4, 2005, which was his 56th calendar day after being hired. (Id.) He also noted that Cooper's representatives believed that Rand was not covered by the CBA.

The Arbitrator indicates that the Soriano did not recall any employee, other than Rand, being discharged for sleeping during working hours. (Id.) Soriano acknowledged, however, that other employees had been suspended and subsequently disciplined for sleeping on the job. (Id.) This was confirmed, according to the Arbitrator, by the Union Shop Chairperson. (Id.)

The Arbitrator next found that the Union conceded that it had never filed a grievance on behalf of any discharged probationary employee. (Id.) He also indicated that Rand admitted that he was sleeping on the job on October 4, 2005. (Id.)

The Arbitrator next provided his "Analysis and Opinion." (Id.) He first found that, "[t]here is no doubt the Grievant [Rand] was sleeping during his working hours, and that he was a probationary employee at the time he was found sleeping." He also found evidence that Cooper

-7-

met with various representatives from the Union concerning Rand's dismissal even though Rand was a probationary employee. (Id.)

The Arbitrator determined that, "for all intents and purposes this situation was treated as requiring proof in accordance with the "just cause" standard. (Id.) It appeared to the Arbitrator that the employer was very aware of the necessity of applying the "just cause" standard to Rand's actions from the very beginning. (Id.) Once, according to the Arbitrator, the employer commenced upon the path of contending it had "just cause" for Rand's discharge, the employer must offer clear and convincing proof that the assessed penalty was for "proper/just cause."

The Arbitrator went on to find that Cooper did not have "proper/just cause" for terminating Rand's employment because Cooper did not administer discipline regarding sleeping on the job in a consistent manner. (Id.) He found that Rand's discharge was a deviation from Cooper's disciplinary practice of suspending employees for the first offense of sleeping during working hours. (Id.) "Granted, the Grievant is a probationary employee, but there is persuasive evidence the management considered he was discharged for good reason and 'just cause'". But, "[i]nconsistent application of disciplinary actions is not a good reason."

The Arbitrator then made his Award. "The Grievant was not discharged for 'just/proper cause.' He must be reinstated to his former position, but without any award of back pay, within ten (10) work days from the date the employer receives this award. This grievance is sustained in part, and denied in part."

Following issuance of the Arbitrator's Award, Cooper filed, on March 8, 2007, its Complaint that is now before the Court. On March 23, 2007, Local 1040 filed its Counterclaim that is now before the Court. The standard of review will next be set forth.

-8-

**STANDARD OF REVIEW**

**<u>Motions for Summary Judgment</u>**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot

rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified

pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

The motions for summary judgment in this case involve an arbitration award. In addition to establishing a standing of review for motions for summary judgment, courts have established specific standards of review for arbitration awards.

### Review of Arbitration Awards

The scope of review of labor arbitration awards is "extremely narrow." *American Postal Workers Union, AFL-CIO v. National Postal Mail Handlers Union*, No. 1:05-CV-01290, 2007 WL 581921 at *3 (D.D.C. Feb. 21, 2007). A federal court only has authority to ensure that the collective bargaining agreement commits the dispute to arbitration, that the arbitration award "grows out of a legitimate process," that the prevailing party did not procure the decision through fraud, that the arbitrator did not suffer from a conflict of interest or exercise dishonesty in reaching his or her decision and that the arbitration award did not merely reflect the arbitrator's own notions of industrial justice. *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M*, 475 F.3d 746, 752 (6th Cir. 2007)(citing *United Paperworkers International Union , AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987), *en banc*, *cert. denied*, 127 S. Ct. 2996 (2007).

If the collective bargaining agreement provides that a dispute should be submitted to arbitration, the underlying question of contract interpretation is for the arbitrator. *Michigan Family Resources,* 475 F.3d at 750 (6th Cir. 2007)(citing *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 568 (1960)). When reviewing the underlying question of contract interpretation, courts are not to consider the merits of the grievance, whether

a particular claim is valid or whether there is language in the collective bargaining agreement that supports the claim. *Id.*

The Sixth Circuit has established a three-part inquiry for the review of an arbitration award. *Id.* at 753. The three questions that a court must ask are: (1) did the arbitrator act outside his authority by resolving a dispute not committed to arbitration; (2) did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award; and (3) in resolving any legal or factual disputes in the case, was the arbitrator arguably construing or applying the contract? *Id.* "So long as the arbitrator did not offend any of these requirements, the arbitration award should be upheld even though the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute." *Id.*

Regarding the first question, courts look to the terms of the collective bargaining agreement to determine whether an arbitrator acted outside his or her authority. *Id.* 750 (citing *United Steelworkers*, 363 U.S. at 582-83.) Arbitration may be conducted only for a dispute that the parties have agreed to arbitrate. *Baton Rouge Oil and Chemical Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 376 (5th Cir. 2002). Also, doubts are resolved in favor of coverage. *Michigan Family Resources*, 475 F.3d at 750.

Whether the arbitrator was "arguably construing or applying the contract" is a difficult question. Yet, in most cases, the award is to be enforced if the arbitrator appeared to be engaged in interpreting the collective bargaining agreement. *Id.* at 753. And, if there is doubt, the court is to presume that the arbitrator was interpreting the contract. *Id.*

In addition to the collective bargaining agreement, an arbitrator may consider the past conduct of the parties but is not bound by such past conduct. *Lattimer-Stevens Co. v. United*

-12-

*Steelworkers of America, AFL-CIO, District 27, Sub-District 5*, 913 F.2d 1166, 1170 (6th Cir. 1990). However, past practice may not be used to overcome plain and unambiguous language in a collective bargaining agreement. *Detroit Coil Co. v. International Association of Machinists & Aerospace Workers, Lodge No. 82*, 594 F.2d 575, 580 (6th Cir. 1979), *cert. denied*, 444 U.S. 840 (1979).

Consideration of the merits of a dispute by the court is the rare exception and not the rule. *Michigan Family Resources*, 475 F.3d at 753. Only when the arbitrator's interpretation of the collective bargaining agreement is "so untethered to" the terms of the agreement that it would cast doubt upon whether the arbitrator was indeed engaged in interpretation would a court consider the merits of a dispute. *Id.* Only when an arbitrator strays from interpretation and application of the collective bargaining agreement "does he enter the forbidden world of 'effectively dispensing his own brand of industrial justice." *Id.* at 752.

### ANALYSIS OF THE MOTIONS FOR SUMMARY JUDGMENT

Local 1040 argues that the Award should not be set aside because the arbitrator did not act outside of the scope of his authority; there is no allegation that the arbitrator committed fraud, had a conflict of interest or otherwise acted dishonestly; and the Award draws its essence from the CBA. Cooper argues that the Award should be set aside because the arbitrator acted outside of the scope of his authority and that the Award was in direct contravention of the CBA. Therefore, this court is being asked to review an arbitration award and must ask the three questions set forth by the Sixth Circuit.

### Acting Outside of Authority?

The first question is, "did the arbitrator act outside of his authority by resolving a dispute

-13-

not committed to arbitration?" The answer in this case is "no."

The CBA provides that grievances not resolved between Cooper and Local 1040 may be submitted to arbitration. Rand's grievance was not resolved by Cooper and Local 1040, and both Parties agreed to submit the grievance to arbitration.

Cooper maintained throughout the process that Rand was a probationary employee not subject to the terms of the CBA and that it was agreeing to the grievance process out of professional courtesy. Nevertheless, for whatever reason, the record is clear that Cooper agreed to arbitrate Rand's grievance.

### Fraud, Conflict of Interest, Dishonesty?

The second question to be asked is, "did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award?" The answer to this question is also "no." Neither party raises allegations that the Arbitrator committed fraud, had a conflict of interest or acted dishonestly.

### Arguably Construing Or Applying Contract?

The third question is, was the arbitrator arguably construing or applying the contract when resolving any legal or factual disputes regarding the grievance? To answer this question, the Court looks to the Award.

In the Award, the Arbitrator first reviews the grievance process followed in this case. The grievance process is set forth in the CBA.

The Arbitrator then identifies relevant documents that were provided to him. These documents include a copy of the CBA and Cooper's Employee's Handbook. The Arbitrator also specifically identifies the language in the CBA that defines a probationary employee.

-14-

The Arbitrator next engaged in findings of fact. He first sets forth the circumstances surrounding Rand's employment and subsequent suspension and termination. He then reviews the grievance process regarding Rand's termination and reviews the arguments presented by Cooper and Local 1040.

The Arbitrator then sets forth the issues that he is to address. The issues that he is addressing are: "Does the "just/proper cause" standard apply to the termination or a probationary employee? If so, was the grievant, a probationary employee, discharged for 'just/proper cause?'"

The Arbitrator next analyzes those issues. He first finds that Rand was sleeping during working hours and that Rand was a probationary employee at the time he was found sleeping. The Arbitrator also found that Cooper met with various Local 1040 representatives regarding Rand even though Rand was a probationary employee.

The Arbitrator next finds that Cooper treated Rand's situation as requiring proof in accordance with the "just cause" standard and that Cooper was "very aware of the necessity of applying the 'just cause' standard" in its treatment of Rand. Although not specifically identified by the Arbitrator, Article 6 of the CBA gives management the right to manage its workforce including suspending and discharging employees for proper cause.

The Arbitrator next determined that, once Cooper "commenced upon the path of contending it had 'just cause' for the discharge of the Grievant [Rand], it must offer clear and convincing proof the assessed penalty was for 'proper/just cause.'" The Arbitrator went on to decide that Cooper did not present clear and convincing proof that Rand had been discharged for "proper/just cause." He based this decision upon the fact that other employees that Cooper had found sleeping on the job had been suspended and not terminated.

-15-

The Arbitrator found that Cooper has the right to make and enforce rules but that this right must be exercised in a consistent manner. Although not specifically referred to as such, this is, of course, a right provided in the Management Clause, Article 6, of the CBA.

Finally, the Arbitrator found that Rand was not discharged for "just/proper cause." He indicated that, "This Award does not imply all future probationary employees are entitled to the benefits and conditions afforded by the collective bargaining agreement."

In sum, it is clear that the Arbitrator was arguably construing and applying the contract when resolving the legal and factual disputes regarding Rand's grievance. He explicitly recognized the grievance process set forth in the CBA and reviewed the Parties' compliance therewith. He explicitly recognized the arbitration clause in the CBA that authorized him to arbitrate the grievance presented to him. He explicitly recognized and applied the definition of a probationary employee set forth in the CBA. Finally, he recognized, without specifically referring to, the "just cause" requirement in the Management Rights clause in the CBA and applied it to Rand.

## Conclusion

The Arbitrator did not act outside his authority, there is no evidence or argument of fraud, conflict of interest or dishonesty and the Arbitrator was arguably construing and applying the CBA. Therefore, this Court may not intervene.

While Local 1040 does not agree with some of the Arbitrator's findings, it does not disagree with the process used or the outcome of the Arbitration. However, Cooper does disagree with the outcome of the Arbitration.

## Cooper Disagrees

-16-

Cooper does not agree with the results of the arbitration. Cooper first argues that the Arbitrator exceeded his scope of authority under the CBA because the Parties did not agree to commit the dismissal or employment changes of a probationary employee, such as Rand, to arbitration. However, Cooper did commit Rand's grievance to arbitration, Rand's grievance was arbitrated and this Court has determined above, using the test set forth by the Sixth Circuit, that this Court may not intervene.

The Arbitrator specifically addressed the issue of who is a probationary employee under the CBA and decided to arbitrate and make an award anyway. Even if this were to be a mistake, the Arbitrator was arguably construing and applying the CBA and a mistake is, therefore, not cause for the Court to intervene.

In support of this first argument, Cooper cites the Sixth Circuit cases of *International Brotherhood of Electrical Workers, Local 429 v. Toshiba America, Inc.*, 879 F.2d 208 (6th Cir. 1989), and *International Association of Machinists and Aerospace Workers, AFL-CIO, District 154, Local Lodge No. 2770 v. Lourdes Hospital, Inc.*, 958 F.2d 154 (6th Cir. 1992). However these cases are unpersuasive. Both predate the new standard of review set forth in *Michigan Family Resources* and both involve an arbitrator that ignored the plain language of the contract, a standard that is no longer in effect. The relative standard that is now in effect is whether the arbitrator was arguably construing or applying the contract.

In support of this first argument, Cooper also cites the Fifth Circuit cases of *United States Postal Service v. American Postal Workers Union*, AFL-CIO, 922 F.2d 256 (5th Cir. 1991), *cert.*

-17-

*denied*, 502 U.S. 906, and *Baton Rouge Oil and Chemical Workers*.[2] However, neither of these cases are persuasive either because they are not mandatory precedent, they predate *Michigan Family Resources* and they are applying a standard of review different from the mandatory standard set forth in *Michigan Family Resources*.

Cooper next argues that its conduct was consistent with the Parties' Agreement because Cooper repeatedly denied the CBA's application to Rand as a probationary employee and the CBA does not apply to probationary employees. Yet, Cooper agreed to arbitrate Rand's grievance that he was unfairly discharged and the Arbitrator decided that he was. Perhaps Cooper should have arbitrated whether or not it was obligated to apply the terms of the CBA to a probationary employee, but it did not.

Cooper also argues that the Award cannot be enforced because it is internally inconsistent. However, the argument is also unpersuasive.

In support of this argument, Cooper cites two cases, *Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, International Union, United Auto., Aerospace and Agr. Implement Workers of America (UAW)*, 500 F.2d 921 (2d Cir. 1974) and *Local 814, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Sotheby's, Inc.*, 665 F. Supp. 1089 (S.D.N.Y. 1987). However, neither of these cases are from the Sixth Circuit and both were decided long before the Sixth Circuit set forth the current standard for review of arbitration

---

[2]In both of these cases, the Fifth Circuit vacated an arbitrator's award because the relevant collective bargaining agreement excluded probationary employees and the grievance submitted was, therefore, not a matter for arbitration.

awards in *Michigan Family Resources* as applied above.[3]

One of the cases cited by Cooper does, however, refer to a Sixth Circuit case,

*International Brotherhood of Electrical Workers, Local 369, AFL-CIO v. Olin Corp.*, 471 F.2d

468 (6th Cir. 1972), in which the court remanded a case to arbitration because an ambiguity

existed between the opinion and award. Even if this law were to apply here, the specific award in

this case is not ambiguous and it is unambiguously related to the issue that the Arbitrator was

deciding. The arbitrator was deciding whether the "just/proper cause" standard applied to Rand's

termination as a probationary employee and, if so, was Rand terminated for "just/proper cause."

The Arbitrator clearly determined that the "just/proper cause" standard applied to Rand and that

he was not terminated for "just/proper cause."

Cooper's final argument is that, by holding that the CBA does not generally apply to

probationary employees except where Cooper agrees to entertain a grievance, the Arbitrator

effectively modified the terms of the CBA. However, this is not what the Award indicates that

the Arbitrator said or did. The Arbitrator specifically said, "This Award does not imply all future

probationary employees are entitled to the benefits and conditions afforded by the collective

bargaining agreement." Also, the Award indicates that it was made because Cooper committed to

the principle of "just cause" or good reason in dismissing probationary employees and did not do

so in Rand's case. While the reason the Arbitrator was involved is that Cooper agreed to

arbitrate, the CBA does not appear to be modified by the Arbitrator's Award.

---

[3]Cooper also cites 9 U.S.C. § 10(d). However, the Section 10 does not include
subparagraph (d) and nothing in Section 10 relates to contradictions in two portions of an
arbitration award.

**SUMMARY**

This Court may not intervene in this dispute between Cooper and Local 1040. The dispute was taken to arbitration and the Arbitrator did not act outside his authority, there is no evidence or argument of fraud, conflict of interest or dishonesty and the Arbitrator was arguably construing and applying the CBA. Cooper and Local 1040 agreed to arbitrate their dispute regarding Rand's discharge and this Court can find no supportable reason to intervene in the result.

Therefore, Cooper's Motion for Summary Judgment (Doc. # 14) is OVERRULED and Local 1040's Motion for Summary Judgment (Doc. #13) is GRANTED. Further, Cooper has requested oral argument on its Motion for Summary Judgment that the Court finds is not necessary in this case. Finally, the captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio this Twentieth day of February, 2008.

**s/Thomas M. Rose**
_____
THOMAS M. ROSE
UNITED STATES DISTRICT

JUDGE

Copies furnished to:

Counsel of Record